UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| EQUITY BANK,<br><br>    Plaintiff.<br><br>v.<br><br>STEPHANIE MORRIS NISSAN, LLC; STEPHANIE MORRIS; CHAD MORRIS; STEPHANIE MORRIS NISSAN OF DURANGO, LLC; WALT, LLC; NISSAN MOTOR ACCEPTANCE COMPANY, LLC; and TBF GRP,<br><br>    Defendants. | Civil Action No. |

**VERIFIED COMPLAINT FOR DAMAGES AND REPLEVIN**

Plaintiff Equity Bank, by and through its undersigned counsel, for its Verified Complaint against Defendants Stephanie Morris Nissan, LLC; Stephanie Morris; Chad Morris; Stephanie Morris Nissan of Durango, LLC; Walt, LLC; Nissan Motor Acceptance Company, LLC; and TBF GRP does state and allege as follows:

**Parties, Jurisdiction and Venue**

1.    Plaintiff Equity Bank ("Equity") is a Kansas state chartered bank, authorized to do business in the state of Missouri, with its principal place of business at 7701 E. Kellogg Rd., Wichita, Kansas 67207.

2.    Defendant Stephanie Morris Nissan, LLC ("SMN") is a Texas limited liability company, with its sole member, Stephanie Morris, residing in the State of Texas. SMN's principal place of business is located at 3432 Stanford Avenue, Dallas, Texas, 75225, and SMN can be served with process in Missouri through its registered agent and office location in Missouri at 3600 S. Limit Ave., Sedalia, Missouri 65301.

4865-5248-0902.4

3. Defendant Stephanie Morris ("Mrs. Morris") is a resident of Texas who resides at 3815 Northwest Parkway, Dallas, Texas 75225.

4. Defendant Chad Morris ("Mr. Morris") is a resident of Texas who resides at 3815 Northwest Parkway, Dallas, Texas 75225.

5. Defendant Stephanie Morris Nissan of Durango, LLC ("SMN Durango," and with Mrs. and Mr. Morris, "Guarantors") is a Texas limited liability company, with its sole member, Stephanie Morris, residing in the State of Texas. SMN's principal place of business is located at 3423 Stanford Avenue, Dallas, Texas, 75225.

6. Defendant Walt, LLC ("Walt") is a Delaware limited liability company. Its sole common member is AgoraTrade, which is a citizen of both Texas and Delaware based on its principal office and state of incorporation. Walt, LLC's mailing address is 700 W. Arkansas Lane, Suite 150, Arlington, Texas 76013.

7. Defendant Nissan Motor Acceptance Company, LLC ("NMAC") is a Delaware limited liability company, and its sole member is Nissan North America, Inc., a Delaware corporation with its principal office in Tennessee, rendering it a citizen of both Delaware and Tennessee. Nissan Motor Acceptance Company, LLC can be served with process in Missouri through its registered agent, CSC-Lawyers Incorporating Service Company, at 221 Bolivar St., Jefferson City, Missouri 65101.

8. Defendant TBF GRP ("TBF") is not registered to do business in the state of Missouri or the state of New Jersey, and its corporate form is therefore unknown. TBF GRP's business address is 19 Spear Rd., Unit 101, Ramsey, New Jersey 07446, and its mailing address is 460 Faraday Ave., Jackson, New Jersey 08527. Upon information and belief, TBF GRP has no members or partners who are residents of the state of Kansas or Missouri.

4865-5248-0902.4

9. SMN is a borrower from Equity, and SMN Durango and Mr. and Mrs. Morris are Guarantors of the loans made by Equity to SMN.

10. The United States District Court for the Western District of Missouri is the proper venue for this action pursuant to 28 U.S.C. 1391(b)(2), because the personal property at issue in this case is believed to be located in this district at the time of the lawsuit.

11. As of the date of the filing of this action, the amount owed by SMN and its Guarantors is approximately $2,516,254.65, plus interest, attorneys' fees and costs, and all other permissible charges.

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332, in that Plaintiff is a Kansas chartered bank with its headquarters in Kansas, while all of the Defendants (including all members of the relevant LLC entities) are not residents of the state of Kansas, meaning that there is complete diversity between the parties. Further, the amount in controversy in this case exceeds $75,000.

**Factual Background**

**The Loan Agreement and Related Documents**

13. On or about August 22, 2022, SMN executed and delivered to Equity that certain Business Loan Agreement (the "Loan Agreement")[1] by which Equity agreed to extend credit to SMN, and SMN agreed to repay Equity for each such extension of credit. A true and accurate copy of the Loan Agreement is attached as Exhibit A. The purpose of the advances and other extensions of credit to be made by Equity to SMN was for the operation of an automotive dealership in Sedalia, Missouri, including the floorplan lending that allowed SMN to purchase certain used vehicles that it would then place for sale at its dealership.

---

[1] Any capitalized terms used in this Complaint that are not otherwise defined carry the definition given to them in the Loan Agreement.
4865-5248-0902.4

14. Pursuant to the terms of the Loan Agreement, SMN, as the borrower, would make requests to Equity for advances of funds to allow SMN to buy certain inventory if and when SMN might so request, and if and when Equity might agree to fund.

15. If Equity made any advances on the Loan Agreement, SMN was then obligated to repay the interest that accrued on the loan amount on a monthly basis, and to repay the entirety of the principal amount due under the Loan Agreement at maturity of the Loan Agreement. When individual vehicles were sold by SMN, SMN was further required to hold the proceeds of such sale in trust for Equity, and to remit those amounts to Equity immediately. These repayment terms were set forth in a Promissory Note (the "Note") executed and delivered to Equity by SMN on or about August 22, 2022, and in a Commercial Security Agreement executed and delivered to Equity on or about August 22, 2022 (the "Security Agreement"). The maximum amount that could be loaned from Equity to SMN under the Loan Agreement and the Note was $3,000,000.00. A true and accurate copy of the Note is attached as Exhibit B, and a true and accurate copy of the Security Agreement is attached as Exhibit C.

16. SMN, in order to induce Equity to enter into the Loan Agreement and to make the advances allowed under the Loan Agreement, agreed to provide Equity with certain collateral for the advances made.

17. Specifically, SMN (as Borrower) agreed in the Security Agreement to provide as collateral (the "Collateral") the following:

> All inventory held for ultimate sale or lease, including inventory which has been or will be supplied under contracts of service, or which are raw materials, works in process, or materials in use or consumed in Debtor's business; whichever and of the foregoing in owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the following: all records of any kind relating to any of the foregoing: including all rights to payment, whether or not earned by performance, including, but not limited to, payment for property or services sold, leased, rented, licensed, or assigned.

In addition, the Collateral included 1) all accessions, attachments, accessories, replacements of and additions to any of the Collateral, whether added now or later; 2) all produces of any of the property described as Collateral; 3) all accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the Collateral; 4) all proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the Collateral, including sums due from third parties who damaged or destroyed any Collateral or from insurers; and 5) all records and data relating to any of the Collateral, whether a writing, photograph, microfilm, microfiche, electronic media, and all of SMN's right, title and interest in and to all computer software required to utilize, create, maintain and process any such records or data on electronic media.

18. Equity perfected its security interest in the Collateral by the filing of UCC-1 financing statements with the Texas Secretary of State on October 3, 2023 and Missouri Secretary of State on September 26, 2022. Copies of the UCC-1 filings are attached as Exhibits D and E.

19. As additional collateral for the Loan Agreement and Note, on or about August 22, 2022, Mr. Morris executed and delivered to Equity a Commercial Guaranty (the "Chad Morris Guaranty"), a copy of which is attached as Exhibit F.

20. In the Chad Morris Guaranty, Mr. Morris agreed that he would "absolutely and unconditionally guarantee full and punctual payment and satisfaction of the Indebtedness of [SMN] to [Equity], and the performance and discharge of all [SMN's] obligations under the Note and the Related Documents."

4865-5248-0902.4

Case 2:23-cv-04210-MDH    Document 1    Filed 11/06/23    Page 5 of 20

21. As additional collateral for the Loan Agreement and Note, on or about August 22, 2022, Mrs. Morris executed and delivered to Equity a Commercial Guaranty (the "Stephanie Morris Guaranty"), a copy of which is attached as Exhibit G.

22. In the Stephanie Morris Guaranty, Mrs. Morris agreed that she would "absolutely and unconditionally guarantee full and punctual payment and satisfaction of the Indebtedness of [SMN] to [Equity], and the performance and discharge of all [SMN's] obligations under the Note and the Related Documents."

23. In addition, as additional collateral for the Loan Agreement and Note, on or about August 22, 2022, SMN Durango executed and delivered to Equity a Commercial Guaranty (the "SMN Durango Guaranty", and together with the Chad Morris Guaranty and the Stephanie Morris Guaranty, the "Guaranties"), a copy of which is attached as Exhibit H.

24. In the SMN Durango Guaranty, SMN Durango agreed that it would "absolutely and unconditionally guarantee full and punctual payment and satisfaction of the Indebtedness of [SMN] to [Equity], and the performance and discharge of all [SMN's] obligations under the Note and the Related Documents."

## The Audit and Defaults

25. On or about September 29, 2023, Equity, pursuant to the terms of the Loan Agreement, conducted a routine physical audit of the SMN business location to confirm the presence of the Collateral that it had financed. In that inspection, Equity determined that various vehicles that it had a security interest in were no longer at the business location, and learned that SMN was firing all of its staff and closing its doors within days.

26. On or about that same date, Equity learned that another lender who made loans to SMN had made a similar discovery regarding vehicles that it had financed for SMN no longer

being on the business premises, and was taking steps to seize collateral, including keys and titles to vehicles.

27. In total, Equity determined that there were 75 vehicles missing from the SMN premises, or a total of approximately $1,808,848.45 in inventory in which Equity has a security interest. To the best of Equity's belief, these vehicles were either "sold out of trust" or transferred to other dealership locations also owned by SMN.

28. Being "sold out of trust" means that a vehicle has been financed by a lender, and rather than complying with the terms of the financing agreement (in this case, the Loan Agreement and the Security Agreement) which require the payment of all principal owed on the loan extended for the purchase of that particular piece of inventory, the borrower had instead retained the proceeds of the sale for its own use. The practical effect of this action by the borrower (in this case, SMN) is to have received the value of the loan from Equity to purchase and then sell Collateral, while leaving Equity with insufficient physical collateral to recover and repay the debts owed under the Loan Agreement.

29. Equity's losses continued to compound themselves as, after the initial audit of SMN's premises, additional vehicles disappeared without explanation the following day, with no payments for any sales of vehicles or otherwise being remitted to Equity for those vehicles.

30. Upon discovering the out of trust sales situation, Equity delivered a notice of default and acceleration, and a demand for payment of the entirety of the outstanding balance owed by SMN. A copy of the notice of default, demand and acceleration is attached as Exhibit I.

31. In the notice, Equity demanded that SMN pay in full the outstanding Indebtedness owed under the Loan Agreement and Note immediately, and further demanded that SMN assemble the Collateral (including all vehicles, keys and titles) to Equity. Despite this demand,

SMN has failed and refused to make payment of the amounts due and owing, or to voluntarily return any of the Collateral.

32. Equity delivered the same notice to all of the Guarantors, as well, demanding payment from them, and the Guarantors similarly failed and refused to make payment despite demands for the same.

33. Despite these demands for payment, the full amount of the indebtedness owed to Equity under the Loan Agreement—which is currently $2,516,254.65, plus interest, attorneys' fees and costs, and all other permissible charges—remains due, owing and unpaid as of the date of the filing of this suit.

34. Pursuant to the terms of the Loan Agreement, it is an event of default:

a) for SMN to fail to make payment of any amount owed when due under the Loan Agreement.

b) for SMN to have a default under any loan or extension of credit with any third party.

c) for SMN to default on any other loan document related to the Loan Agreement, including the Note and the Security Agreement.

d) for there to be an adverse material change in SMN's financial condition, or for Equity to believe the prospect of payment or performance under the Loan Agreement is impaired.

It is equally an event of default under the Note:

e) for SMN to fail to make any payment due under the Note; and

f) for SMN to have defaults in payment to third parties.

Under the Security Agreement, it was an event of default:

4865-5248-0902.4

g) for SMN to fail to make payment on the Note.

h) for SMN to perform any other obligation under the Security Agreement. Among the obligations required of SMN under the Security Agreement was:

1) that SMN failed to deliver documents related to the Collateral to Equity as required;

2) the Collateral was not to be removed from the business premises in violation of the Security Agreement;

3) the Collateral was not to be sold or transferred outside of the ordinary course of business;

4) the Collateral was not to be made subject to any liens or security interests;

5) the proceeds of sale of any Collateral were to be held in trust separately for the benefit of Equity and immediately paid to Equity; and

6) the Collateral was to be made available for inspection by Equity.

SMN was obligated by the Security Agreement:

i) to notify Equity in the event that any Collateral was moved or otherwise not held at the required location;

j) as to the sale of any Collateral;

k) to provide certain financial statements to Equity, as were the Guarantors; and

l) to provide notice to Equity of any material adverse change in SMN's financial condition and of any claims asserted against SMN by other creditors.

And the Guarantors not only guaranteed payment of all amounts due and owing, but also guaranteed performance of all of SMN's obligations under the Loan Agreement. With respect to

4865-5248-0902.4

**all** these obligations, SMN and Guarantors, respectively, failed to comply with their contractual agreements.

35. Among the remedies available to Equity in the event of defaults by SMN are that Equity:

a) can accelerate and demand payment in full of all amounts due and owing under the Loan Agreement and Note;

b) can require SMN to assemble the Collateral and turn over any and all certificates of title and other documents related to the Collateral;

c) can enter the property and immediately take possession of any and all Collateral;

d) can sell the Collateral and apply the proceeds to the Indebtedness; and

e) has all other rights and remedies granted to a secured lender pursuant to the Uniform Commercial Code.

36. Similarly, Mr. Morris, Mrs. Morris and SMN Durango, by virtue of the terms of the Guaranties, also owe to Equity the amounts set forth in Paragraph 30.

37. Pursuant to the terms of the Loan Agreement, the Note, the Security Agreement and the Guaranties, SMN, Mr. Morris, Mrs. Morris and SMN Durango are also liable for the payment of Equity's legal fees and other expenses incurred in connection with this lawsuit.

### Count I- Breach of Contract (SMN)

38. Equity realleges and incorporates by reference herein the allegations contained in prior paragraphs of this Complaint as though set forth fully herein.

39. SMN has breached the terms of the Loan Agreement, Security Agreement and Note by, among other things, failing to make payments when they are due and owing thereunder; by selling Collateral out of trust; by making false statements or representations to Equity in

4865-5248-0902.4

connection with advances made under the Loan Agreement; by SMN and its affiliates and Guarantors becoming the subject of creditor proceedings by other lenders and defaulting on loans with other creditors; and by SMN's failure and refusal to return Collateral to Equity when requested.

40. Equity has performed all obligations required of it under the Loan Agreement, as well as any conditions precedent to recovery which might exist under the Loan Agreement, related documents, or applicable law.

41. As a direct result of SMN's breaches of the Loan Agreement and Note, Equity has suffered damages in no less than the amount of $2,516,254.65, plus interest, attorneys' fees and costs, along with such additional amounts as are continuing to accrue after the filing of this Complaint.

**Count II—Breach of Guaranties (Mr. Morris, Mrs. Morris, SMN Durango)**

42. Equity realleges and incorporates by reference the allegations contained in prior paragraphs as though set forth fully herein.

43. Pursuant to the terms of the Guaranties, the Guarantors are personally liable for all indebtedness due and owing by SMN under the Loan Agreement and Note, whether when due or upon acceleration. The full amount of the indebtedness owed by SMN under the Loan Agreement and Note has been accelerated by Equity.

44. The Indebtedness owed by SMN under the Loan Agreement and Note, and by extension by the Guarantors under the Guaranties, remains due and owing as of the date of the filing of this lawsuit.

45. As a result of the failure of the Guarantors to pay the amounts due and owing to Equity under the Loan Agreement and Note, Equity has suffered damages.

46. Guarantors expressly waived any right of presentment, protest, demand or notice, and further waived any "one action" or "anti-deficiency" defenses that they might have, or any other defenses other than payment and performance of the Indebtedness.

47. As a direct result of Guarantors' breaches of the Guaranties, Equity has suffered damages in no less than the amount of $2,516,254.65, plus interest, attorneys' fees and costs, along with such additional amounts as are continuing to accrue after the filing of this Complaint.

### Count III—Replevin (SMN)

48. Equity realleges and incorporates by reference the allegations of prior paragraphs as though set forth fully herein.

49. Pursuant to the terms of the Security Agreement, upon the occurrence of an event of default, SMN was obligated to return possession of the Collateral to Equity.

50. Equity demanded that SMN voluntarily surrender possession of the Collateral to Equity, including keys and titles to the vehicles constituting the Collateral, but SMN refused to comply with this demand.

51. SMN is believed to continue to possess Collateral in which Equity has a security interest and to sell such Collateral, without paying Equity the proceeds of these sales, to Equity's detriment.

52. If SMN is allowed to continue to retain possession of the Collateral, Equity's interest in the Collateral will continue to be adversely affected.

53. The Collateral in which Equity has a security interest is included in the attached Exhibit J, and Equity seeks an order compelling the return of the same to Equity immediately, along with all keys and titles or MSOs for any vehicles included immediately.

54. SMN's willingness to ignore its various obligations under the Loan Agreement and other Loan Documents demonstrates that there is a continued risk that SMN will similarly fail to abide by its obligations under the Loan Agreement and Security Agreement with regard to possession of the Collateral, as well, further necessitating the return of the Collateral by legal process.

55. Upon information and belief, none of the Collateral has been taken for tax, assessment or fine levied by virtue of any law of the state of Missouri or any other state, nor seized by any legal process, execution or attachment, nor held by virtue of any order of replevin against SMN.

56. The approximate values of the various items of Collateral are included in Exhibit J, and those values should form the basis for any bond required by the Court in order to issue an order of replevin.

57. Pursuant to RSMO §533.020, Equity is entitled to the issuance of an order of replevin declaring that Equity is entitled to possession of the Collateral, and directing the sheriff of Pettis County, or any other county in which the Collateral might be located, to take immediate custody, control and possession of the Collateral, including keys and titles to the same, and to deliver the Collateral to Equity upon Equity's delivery of an appropriate bond to the sheriff.

**Count IV—(Protection of Security Interest in Collateral, for Injunctive Relief, Temporary Restraining Order, Preliminary Injunction and Permanent Injunction)**

58. Equity realleges and incorporates by reference the allegations contained in prior paragraphs as though set forth fully herein.

59. SMN, as security for the amounts due and owing to Equity, pledged various items of personal property which constitute the Collateral (as defined in the Loan Agreement and Security Agreement).

4865-5248-0902.4

60. The Collateral is believed to be primarily located at, among other places, the SMN dealership premises, located at 3600 S. Limit Ave., Sedalia, Missouri 65301.

61. Equity has declared SMN in default of its obligations under the Loan Agreement, and demanded payment in full of the amounts due and owing under the Loan Agreement. SMN has failed and refused to make payment despite these demands, and remains in possession of the Collateral.

62. To the best of Equity's knowledge and belief, the Collateral has not been seized or taken by any party for a fine, tax or assessment pursuant to law, or by virtue of levy or execution by any other creditor.

63. The Collateral was financed by Equity, and came into the possession of SMN as a result of financing provided to SMN by Equity pursuant to the Loan Agreement.

64. Equity has made demands for the voluntary surrender of the Collateral, which demands have been refused by SMN.

65. Equity believes that the Collateral, or some portion thereof, has been wrongfully leased, sold, transferred, assigned, consigned, auctioned, concealed, pledged, financed, or otherwise disposed of in violation of the terms of the Loan Agreement and of applicable law.

66. Further, SMN has failed and refused to remit to Equity the proceeds of the Collateral that has been wrongfully disposed of as set forth herein.

67. As a result of the failure of SMN to abide by the terms of the Loan Agreement and applicable law and to remit the amounts paid for Collateral that has been sold, leased or otherwise disposed of, Equity has suffered pecuniary damages. Further, because of the dissipation of the Collateral as set forth herein, Equity now deems itself inadequately secured and protected with regard to the amounts due and owing to it under the Loan Agreement.

68. SMN's continued retention and sale of Collateral, under the terms of the Loan Agreement, is wrongful and a violation of the terms of the Loan Agreement.

69. As a result of these violations, Equity is entitled to a temporary restraining order, preliminary injunction and permanent injunction against all Defendants. The injunctive relief is necessary to restrain Defendants from leasing, selling, transferring, assigning, consigning, auctioning, concealing, pledging, financing, or otherwise disposing or granting a security interest in any of the Collateral which Equity holds a security interest in pursuant to the Loan Agreement and Security Agreement, unless (1) Defendants immediately report any sales or other transactions before their conclusion, (2) Defendants immediately remit in certified or other immediately available funds to Equity all invoice proceeds from sales of vehicles and other Collateral in amounts no less than the floorplan balance, (3) Defendants turn over all certificates of title ("COTs"), manufacturer's statements of origin ("MSOs"), any other documentary evidence of ownership, and keys relating to Equity's Collateral, and (4) Defendants release and surrender to an officer or representative of the Court all monies and amounts currently held by representatives of Defendants, or to which Defendants jointly and/or individually have access or rights, which monies were obtained through the lease, sale, auction, transfer, assignment, consignment, or other transfer or disposition, in or out of trust, of any Collateral disposed of by SMN.

### **Count V-Fraud (SMN, SMN Durango, Mr. and Mrs. Morris)**

70. Equity realleges and incorporates by reference the allegations in all preceding paragraphs as though set forth fully herein.

71. As set forth herein, Defendants SMN, SMN Durango, Mr. Morris and Mrs. Morris have consistently engaged in misrepresentations as to the existence, location and current sale status of Collateral that was financed through Equity.

72. Specifically, these Defendants have, either affirmatively or through silence, made representations to Equity that certain Collateral purchased by these Defendants was still in Defendants' possession, and that it was at a specific location, and that any sale of the Collateral would be reported to Equity and the proceeds of such sale remitted to Equity, when in fact these Defendants had sold the subject Collateral and retained the proceeds of those sales for their own use.

73. At the time that these Defendants made these misrepresentations to Equity, Defendants were aware of the falsity of their representations. Specifically, these Defendants were aware that the Collateral that they had sold was no longer in their possession or control, contrary to their contractual obligations and contrary to the statements or omissions that they were making to Equity.

74. As part of these Defendants' scheme to defraud Equity, they intended that Equity rely on their statements and/or their silence as to the whereabouts and sale status of Equity's Collateral, with the expectation that Equity would not act to protect its rights as a result of those statements and/or silence.

75. Equity's reliance on these representations from Defendants was reasonable under the circumstances. These Defendants were under an obligation to report the sale of any Collateral and remit the proceeds of such sale to Equity, and failed to do so. Given the obligations that these Defendants had with regard to the Collateral, it was reasonable for Equity to rely on these misstatements and omissions from these Defendants.

76. As a result of these misstatements and omissions from these Defendants, Equity has suffered substantial damages. As of the date of the filing of this lawsuit, Equity has suffered at least $1,808,848.45 in damages for Collateral which has been sold out of trust.

### Count VI—Quiet Title (All Defendants)

77 Equity realleges and incorporates by reference the allegations in all preceding paragraphs as though set forth fully herein.

78. Equity claims an interest in the items of personal property that are identified in Exhibit J based on its financing of the purchase of those items, and its security interest received in those same items as a result of that financing.

79. Defendants are or may also claim an interest in the same items of personal property that are identified in Exhibit J on the basis of their UCC filings in Missouri or Texas in which they may assert a security interest in the same items, their physical possession of the personal property, or their ownership interest in one of the entities that may have or claim a right to possession or ownership of those items.

80. Equity is entitled to an adjudication from this Court that it has a superior interest or title in the personal property identified in Exhibit J than Defendants, or any other party which might claim an interest in the same.

### Count VII—Declaratory Judgment (Defendants Walt, NMAC and TBF)

81. Equity realleges and incorporates by reference the allegations in all preceding paragraphs as though set forth fully herein.

82. Equity, Walt, NMAC and TBF each have asserted or may rights to certain items of Collateral on the basis of UCC filings in Missouri, Colorado or Texas.

4865-5248-0902.4

83. Based on the timing of the security agreements or other agreements which created the alleged rights of each of these parties, and the timing of their respective UCC filings and the funding or financing provided by them to SMN or its affiliates, a real and justiciable controversy exists as to the relative priority of their respective claims to the Collateral and other items of personal property at issue in this case.

84. Each of Equity and these defendants has a legally protectable interest in the Collateral and other items of property, as reflected in their UCC filings and respective agreements with SMN.

85. Because of the defaults on the Loan Agreement and other defaults committed by SMN against its various creditors, determination of the relative priority of interests as between these defendants and Equity is ripe for adjudication by the Court.

86. As to the specific issue of the relative priority of the interests of each of the parties, there is no legal remedy available to adequately determine the priority of these parties to the Collateral and other items of property at issue herein.

87. Accordingly, Equity asks that the Court enter a declaratory judgment regarding the relative priority of these parties to the Collateral and other items of personal property.

**Prayer for Relief**

WHEREFORE, Plaintiff Equity Bank prays for judgment against Defendants, and each of them, as follows:

1) For damages in the amount of $2,516,254.65, plus interest as it accrues daily;

2) For punitive and other permissible damages arising from the Defendants' fraud as alleged in Count V;

3) For attorneys' fees and costs as they accrue and are proven in the course of this case;

4865-5248-0902.4

4) For a temporary restraining order against Defendants and their respective agents, servants, employees, representatives, and all other persons acting on behalf of or with the authority of Defendants, from leasing, selling, transferring, assigning, consigning, auctioning, concealing, pledging, financing, or otherwise disposing or granting a security interest in any of the Collateral which Equity holds a security interest in pursuant to the Loan Agreement and Security Agreement, unless (1) Defendants immediately report any sales or other transactions before their conclusion, (2) Defendants immediately remit in certified or other immediately available funds to Equity all invoice proceeds from sales of vehicles and other Collateral in amounts no less than the floorplan balance, (3) Defendants turn over all COTs, MSOs, and keys relating to Equity's Collateral, and (4) Defendants release and surrender to an officer or representative of the Court all monies and amounts currently held by representatives of Defendants, or to which Defendants jointly and/or individually have access or rights, which monies were obtained through the lease, sale, auction, transfer, assignment, consignment, or other transfer or disposition, in or out of trust, of any Collateral disposed of by SMN;

5) For an order of replevin granting Equity the right to recover all of the Collateral set forth in Exhibit J, including keys and titles to the same, and to set any bond the Court deems necessary to satisfy Equity's obligations under Missouri law;

6) For the Court to quiet title to the same items of Collateral and to declare the relative priorities to the Collateral and any other personal property as between Equity and other interested creditors and owners of the same;

7) For all other relief the Court deems just and proper under the circumstances.

4865-5248-0902.4

KUTAK ROCK LLP
/s/ Justin Nichols
Justin Nichols, MO #56920
John Coghlan, MO # 36361
2300 Main Street, Suite 800
Kansas City, MO 64108
Phone: (816) 960-0090
Justin.Nichols@KutakRock.com

## VERIFICATION

I, Joshua J. Means, declare as follows:

1. I am a CEO-Community Banking with Equity Bank. ("Equity").

2. I have personal knowledge of the business of Equity as it relates to the Defendants, including the allegations set forth in the foregoing Verified Complaint, and if called on to testify I would competently testify as to the matters stated herein.

3. I verify pursuant to 28 U.S.C. § 1746, under penalty of perjury and under the laws of the United States of America that the factual statements in the Verified Complaint concerning Equity, its activities, and its intentions are true and correct, as are the factual statements concerning the Defendants, their activities, and their intentions.

Dated: 11/1/23